(No. 21285.—

CARL KIEFER *vs.* THE ELGIN, JOLIET AND EASTERN RAIL-
WAY COMPANY, Plaintiff in error.—(EDWARD M.
MILLER, Admr., Defendant in Error.)

*Opinion filed February 23, 1933—Rehearing denied April 5, 1933.*

Dunn, J., dissenting.

Knapp, Beye, Allen, Cochran & Cushing, (Joseph L. Earlywine, and Paul R. Conaghan, of counsel,) for plaintiff in error.

Finn & Miller, (Frank Johnston, Jr., of counsel,) for defendant in error.

Mr. Justice Duncan delivered the opinion of the court:

In an action under the Federal Employer's Liability act in the superior court of Cook county, Carl Kiefer (herein called plaintiff) recovered a judgment against plaintiff in error, the Elgin, Joliet and Eastern Railway Company, (herein called defendant,) for $12,000 for personal injuries sustained by him while in the employ of defendant. The judgment was affirmed by the Appellate Court for the First District. The record was brought to this court for review by writ of *certiorari*, the plaintiff being named as the defendant in error. On November 16, 1932, the defendant filed an instrument suggesting the death of the plaintiff, accompanied by a motion that the legal representative of the deceased plaintiff be substituted as defendant in error, supported by an affidavit, upon information and belief, that the plaintiff died from natural causes at Pendleton, Oregon, on February 3, 1932. Thereafter Finn & Miller, attorneys for the plaintiff, filed the appearance of Edward M. Miller, administrator of the estate of Carl Kiefer, deceased, as defendant in error for the further prosecution of the cause.

Plaintiff, who was fifty-nine years old, was employed by defendant as a switchman in its yards at Joliet, and on June 29, 1929, when he was injured, had been so employed for about two years and eight months. Defendant is an interstate carrier. Its yards at Joliet are seven in number, designated by letter from "A" to "G," inclusive. On the evening of the injury plaintiff was working in these yards with a switching crew consisting of himself, a foreman, an engineer, a fireman and another switchman. Shortly before the injury, which occurred at about 8:30 o'clock, the locomotive engine that was being used by the switching crew was run onto a track in yard "A" called the "air line," to get three cars. While the locomotive was being coupled onto these cars plaintiff stood on the lead-track to watch. The two rear cars in this string of three cars were switched onto track 5 in yard "A." After these two cars had been placed on that track, the locomotive with the third car, an empty gondola car, ran south onto a track called the "old main line." This car was to be placed on track 3 in yard "C." The locomotive was headed south. It had a tender on it and the gondola car was coupled to this tender. While the locomotive was standing on the old main line track plaintiff adjusted a puzzle-switch so that the car could be backed north onto track 3 in yard "C." He then walked south until near the north end of the gondola car and gave the engineer the signal to back up. When the south end of the gondola car came opposite him he took hold of the hand-hold on that end of that car with his left hand and attempted to step onto the foot-board on the north end of the tender. His foot missed the foot-board of the tender and his feet were dragged on the ground while he was holding to the hand-hold on the gondola car with his left hand. While he was being dragged in that manner the toes of his right foot were caught in the puzzle-switch, which forced him to break his hold and caused him to be thrown violently to the ground. His right foot and right leg were severely

injured and the wheels on the tender passed over his left leg, and as a result of the injury it was necessary for him to have his left leg amputated at a point about eight inches below the knee.

Plaintiff testified that yard "C" was used for distributing cars to be used in making up trains that ran from Joliet to points in Indiana; that every evening his switching crew put on track 3 in yard "C" cars bound for Griffith, Dyer and Hartsdale, Indiana; that later his crew would pull those cars off of that track and switch them to yard "D," where the crew placed them into a train to go to Indiana; that an "extra" train made up in that way left Joliet for Indiana every night; that on the evening of the injury, and prior to the switching operation in which the injury occurred, the switching crew had placed on track 3 in yard "C" five or six cars that were to go to Dyer, Griffith and Hartsdale; that it was part of the duty of the switching crew with which he was working, to switch the cars which they placed on track 3 in yard "C" to yard "D" and make up the train that was later in the evening to be carried to, and in part distributed at, points in Indiana; that the two rear cars of the three taken from the air line track just prior to the injury had cards tacked onto them which showed they were to go to Rockdale, Illinois; that the empty gondola car was a Chesapeake and Ohio railroad car and was "carded" to Griffith, Indiana; that that car came from the repair track that evening, and he "expected" it was carded before it went to the repair track; that he knew where the car was going by the card on it and that it was his business so to know; that in the operation of switching this car onto track 3 in yard "C" it was his duty to get onto the foot-board of the tender and ride there until the foreman gave him a signal to get off and uncouple the car so that it would roll onto said track of its own momentum; that when he took hold of the hand-hold the car was moving about four miles an hour; that as he at-

tempted to step onto the foot-board of the tender the engineer suddenly, without warning, increased his speed, which gave plaintiff a jerk and caused his foot to miss the footboard. Plaintiff testified further that he did not know the number of the gondola car being moved at the time he was injured and did not know what was done with it later that evening.

Plaintiff introduced evidence to show that three empty gondola cars of the Chesapeake and Ohio Railroad Company left Joliet on the extra train No. 711 of defendant at 11:15 o'clock on the night of the injury and were delivered to the agent of said railroad company at Griffith, Indiana, on the following day, June 30, 1929, but there is no direct proof that any one of these three cars was the one being switched at the time of the injury.

At the close of the evidence for the plaintiff, and again at the close of all the evidence, defendant made a motion for a directed verdict. It is contended by defendant that the court erred in not granting these motions, because there was no proof that plaintiff at the time of the injury was engaged in interstate commerce. Whether or not an employee of a railroad company is at the time he sustains an injury engaged in interstate commerce within the meaning of the Federal Employer's Liability act depends upon whether or not he is engaged in interstate transportation or in work so closely related to it as to be practically a part of it. (*Shanks* v. *Delaware, Lackawanna and Western Railroad Co.* 239 U. S. 556, 36 Sup. Ct. 188; *Chicago and Northwestern Railway Co.* v. *Bolle,* 52 U. S. 59; *Gidley* v. *Chicago Short Line Railway Co.* 346 Ill. 122.) The hauling of empty cars from one State to another is interstate commerce. (*North Carolina Railroad Co.* v. *Zachary,* 232 U. S. 248, 34 Sup. Ct. 305.) Preparatory movements in aid of interstate transportation are a part of interstate commerce. (*Southern Railway Co.* v. *Puckett,* 244 U. S. 571, 37 Sup. Ct. 703; *Louisville and Nashville Railroad Co.*

v. *Parker*, 242 id. 13, 37 id. 4.) Whether or not a switchman engaged in a switching operation in a railroad yard is engaged in interstate commerce depends upon whether or not the cars being moved are interstate or intrastate cars and upon the purpose of the movement. If the cars being moved are not at the time of the movement designated for interstate transportation and the purpose of the movement is not to facilitate the movement of cars so designated the switchman is not engaged in interstate commerce. (*Rogers* v. *Canadian Nat. Railway Co.* 246 Mich. 399, 224 N. W. 429; *Wise* v. *Lehigh Valley Railroad Co.* 43 Fed. (2d series) 692.) If the cars being moved are assigned to interstate transportation, or if the purpose of the movement is to facilitate the movement of interstate cars, then the switchman is engaged in interstate commerce. *Louisville and Nashville Railroad Co.* v. *Parker, supra; Pennsylvania Co.* v. *Donat,* 239 U. S. 50, 36 Sup. Ct. 4; *Bruckshaw* v. *Chicago, Rock Island and Pacific Railway Co.* 173 Iowa, 207, 155 N. W. 273.

In *Rogers* v. *Canadian Nat. Railway Co. supra,* it was held that a switchman was not engaged in interstate commerce in moving two empty cars from a manufacturing plant, to which they had conveyed interstate shipments, to the railroad yard of the defendant, because at the time of moving the cars they had not been designated for interstate transportation. The court said: "It does not aid plaintiff to assume that the empty cars being switched when he received his injury were foreign-owned and had been engaged in interstate transportation or later again entered upon interstate transportation. * * * The cars had finished their interstate business and had not entered upon any other, so far as the proofs disclose. Their next work or movement, so far as appears, might have been interstate or intrastate, as might happen. At the time of the accident the empty cars were not engaged in commerce at all but being moved in readiness for later clearance, as might be

ordered. Their character as instruments of commerce, interstate or intrastate, depended upon the purpose of their movement at the time of the accident and not upon remote probabilities or later events. * * * Had plaintiff been engaged in switching the empty cars under predetermined assembly and for immediate removal out of the State he would have been employed in interstate commerce." In *Bruckshaw* v. *Chicago, Rock Island and Pacific Railway Co. supra*, it was held that a switchman engaged at a point in Iowa in switching cars preparatory to putting them in a train to begin their journey back to their points of origin outside of that State was engaged in work "so clearly related to interstate commerce as to be, in practice and in legal contemplation, a part of it." In *Louisville and Nashville Railroad Co.* v. *Parker, supra*, a switchman was injured while moving an empty car, not moving in interstate commerce, from one switch-track to another. The court said that if "this movement was simply for the purpose of reaching and moving an interstate car the purpose would control and the business would be interstate." It further said: "The difference is marked between a mere expectation that the act would be followed by other work of a different character * * * and doing the act for the purpose of furthering the later work."

From the foregoing cases it appears that if, at the time plaintiff was engaged in the operation of switching the empty Chesapeake and Ohio railroad gondola car to track 3 in yard "C," that car had been designated and assigned to a movement from the Joliet yard to a point in Indiana and the switching movement was made for the purpose of facilitating the placement of that car in a train in which it would be moved to Indiana, then plaintiff at the time he was injured was engaged in interstate commerce within the meaning of the Federal Employer's Liability act. The testimony of plaintiff that track 3 in yard "C" was customarily used for the purpose of assembling cars designated to be taken

to points in Indiana and that were to be made up into a train that went out of the Joliet yard each night for points in Indiana, together with his testimony that the card on the empty gondola car that was being switched at the time of the injury indicated that that car was to go to Griffith, Indiana, and the showing that that gondola car was being switched onto track 3 in yard "C" at the time of the injury, constituted proof from which the jury could find that the plaintiff was engaged in interstate commerce at the time he was injured. The evidence did not show definitely that the particular empty gondola car that was being switched at the time of the injury moved out of the Joliet yard to Griffith on the night that plaintiff was injured, but it did show that three empty gondola cars of the Chesapeake and Ohio Railroad Company left the Joliet yard on a train of defendant at 11:15 o'clock that night and were delivered to the Chesapeake and Ohio Railroad Company at Griffith on the following day. The evidence for the plaintiff established facts from which the jury could find that plaintiff at the time of his injury was engaged in interstate commerce, and the court did not err in refusing a directed verdict for defendant because of a failure of proof in that respect.

It is contended by defendant that the trial court erred in not granting the motions for a directed verdict because the evidence showed that plaintiff assumed the risk incident to boarding the moving locomotive. "The burden of proof of the assumption of risk was upon the defendant, and unless the evidence tending to show it was clear and from unimpeached witnesses, and free from contradiction, the trial court could not be charged with error in refusing to take the question from the jury." (*Kanawha and M. Railway Co.* v. *Kerse,* 239 U. S. 576, 36 Sup. Ct. 174.) In *Chesapeake and Ohio Railway Co.* v. *DeAtley,* 241 U. S. 310, 36 Sup. Ct. 564, the Supreme Court of the United States, in discussing the question of the assumption by a

railroad switchman of the risk of boarding a moving train said: "On the facts of the case before us, therefore, plaintiff having voluntarily entered into an employment that required him, on proper occasion, to board a moving train, he assumed the risk of injury normally incident to that operation, other than such as might arise from the failure of the locomotive engineer to operate the train with due care to maintain a moderate rate of speed in order to enable plaintiff to board it without undue peril to himself. But plaintiff had the right to presume that the engineer would exercise reasonable care for his safety, and cannot be held to have assumed the risk attributable to the operation of the train at an unusually high and dangerous rate of speed until made aware of the danger, unless the speed and the consequent danger were so obvious that an ordinarily careful person in his situation would have observed the one and appreciated the other." While the evidence for the defendant was that there was no increase in the speed of the engine at the time plaintiff attempted to place his foot on the foot-board of the tender, that evidence is directly contrary to the testimony of plaintiff that at the time he attempted to board the locomotive the engineer suddenly increased the speed, with the result that there was a jerk which caused plaintiff's foot to miss the foot-board. Plaintiff did not assume the risk incident to a sudden increase in speed at the very moment he was attempting to board the locomotive, when the engineer had knowledge that he was about to do so. The plaintiff's evidence tended to establish the fact that there was such sudden increase of speed at that moment, and the court did not err in refusing a directed verdict for the defendant on the ground that the plaintiff assumed the risk.

It is further contended that the evidence establishes that the injury was the result of the negligence of the plaintiff and not of the defendant. The negligence alleged in the declaration was the action of the engineer in suddenly in-

creasing the speed of the locomotive at the time plaintiff attempted to board it. There was evidence tending to establish such negligence on the part of the engineer. The Appellate Court has affirmed the judgment, and the question of the weight of the evidence is not one for us to decide.

The judgment of the Appellate Court for the First District is affirmed.

*Judgment affirmed.*

Mr. JUSTICE DUNN, dissenting.